Diane JAMES, Plaintiff–Appellant,

v.

**FLEET/NORSTAR FINANCIAL GROUP, INC., Defendant–Appellee.**

No. 741, Docket 92–7946.

United States Court of Appeals, Second Circuit.

Argued Jan. 7, 1993.

Decided May 4, 1993.

Barry S. Zitser, Hartford, CT (Peter G. Perakos, II, of counsel), for plaintiff-appellant Diane James.

Peter A. Janus, Hartford, CT (Dana Shaw MacKinnon, of counsel), for defendant-appellee Fleet/Norstar Financial Group, Inc.

Before: PRATT, FRIEDMAN,* and MAHONEY, Circuit Judges.

FRIEDMAN, Circuit Judge:

The principal question in this appeal is whether an employer's undertaking to give employees sixty days of pay following their last day of work if the employees would remain on the job until an internal consolida-

tion was completed, created an "employee welfare benefit plan" under the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.* (1988). The district court held that the undertaking created a plan and that ERISA preempted state law claims based on the employer's cancellation of the plan. We hold that the undertaking did not constitute such a "plan," and therefore reverse the district court's grant of summary judgment dismissing the complaint insofar as it asserted state law claims. We affirm, however, the judgment insofar as it dismissed the claim that the cancellation violated ERISA.

I

A. In May 1990, the appellee, Fleet/Norstar Financial Group, Inc. (Fleet), informed the employees at its Newington Service Center, both at a meeting and by letter, that it would consolidate some of its operations at the Center with its operations elsewhere, and that, as a result, employees at the Center would be discharged. Fleet also announced a Severance Pay and Benefits Plan and an Incentive Stay and Bonus Agreement to encourage employees, whom the bank would terminate upon consolidation, to stay until the consolidation was complete.

Under the Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. § 2101, et seq. (1988), Fleet was required to give its employees 60–days notice prior to discharging them, because the consolidation plan constituted a "plant closing" under the Act. The May letter stated that Fleet would give those employees who would be discharged 60–days notice of their separation date.

On September 15, 1990, Fleet orally told the employees that, if they continued to work until the consolidation was completed, they would receive 60–days additional pay following their last day of work, which they could take either in a lump sum or in bi-weekly installments. Fleet took this action because, at that time, it could not determine when each of the employee's employment would

---

* Daniel M. Friedman, of the Court of Appeals for the Federal Circuit, sitting by designation.

end, and therefore could not give the employees the 60–day notice WARN required.

On November 15, 1990, Fleet cancelled the 60–days additional pay and notified the employees that they could continue to work for 60 days more at their regular pay. The employment of all those employees terminated on January 15, 1991. The appellant, Diane James, was one of those employees.

B.   James then filed, in the United States District Court for the District of Connecticut, a diversity suit (certified as a class action) against Fleet on behalf of those employees at Newington who had worked after November 15, 1990, but had not received the 60–days additional pay upon their discharge. In her amended complaint, James asserted three state law claims (Counts I–III: breach of contract, negligent misrepresentation, and a state statutory wage claim) and a claim (Count IV) based on violation of ERISA.

On cross-motions for summary judgment, the district court denied James' motion, granted Fleet's motion, and dismissed the complaint. The court held that Fleet's undertaking to give 60–days additional pay was an offer of severance pay; that the undertaking constituted an "employee welfare benefit plan" under ERISA; and that ERISA's preemption provision preempted James' three state law claims. The court further held that James' ERISA claim in Count IV failed because, under ERISA, Fleet unilaterally could terminate its promise of severance payments.

## II

A.   "ERISA was passed by Congress in 1974 to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits." *Massachusetts v. Morash*, 490 U.S. 107, 112, 109 S.Ct. 1668, 1671, 104 L.Ed.2d 98 (1989). "To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator." *Id.* at 115, 109 S.Ct. at 1673. ERISA governs "employee benefit plan[s]" which it defines as an "employee welfare benefit plan," an "employee pension benefit plan," or

a plan that is both. 29 U.S.C. § 1002(3). The statute defines an "employee welfare benefit plan" as

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title [which includes "severance or similar benefits"] (other than pensions on retirement or death, and insurance to provide such pensions).

*Id.* § 1002(1).

ERISA contains a broad preemption provision, which states that its regulatory provisions

supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

*Id.* § 1144(a). Section 1003(a) makes ERISA applicable, with exceptions not here relevant, to "any employee benefit plan ... established or maintained—(1) by any employer engaged in commerce or in any industry or activity affecting commerce; or (2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or (3) by both." Fleet does not question that it is subject to ERISA.

If an employer's program is an employee welfare benefit plan, ERISA preempts state laws that "provide an alternative cause of action to employees to collect benefits protected by ERISA." *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989). The question before us, therefore, is whether Fleet's undertaking to

give its employees 60–days additional pay upon termination of their employment following the consolidation of its functions constituted an "employee welfare benefit plan" under ERISA.

B. The Supreme Court dealt with a closely related question in *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). That case involved a Maine statute that required certain employers, on the closing of a plant, to give terminated employees who had worked in the plant three or more years a severance payment of one week's pay for each year of employment. *Id.* at 5, 107 S.Ct. at 2214. The Court held that ERISA did not preempt the statute "because the statute neither establishes, nor requires an employer to maintain, an employee welfare benefit 'plan' under the federal statute." *Id.* at 6, 107 S.Ct. at 2215 (footnote omitted).

The Court ruled that preempting the Maine statute "would not further the purpose of ERISA pre-emption," *id.* at 8, 107 S.Ct. at 2216, and that "the Maine statute in no way raises the types of concerns that prompted pre-emption." *Id.* at 11, 107 S.Ct. at 2217. It stated:

> Congress intended pre-emption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. This concern only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation. It is for this reason that Congress pre-empted state laws relating to *plans,* rather than simply to *benefits.* Only a plan embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation.

*Id.* at 11–12, 107 S.Ct. at 2217–18.

The Court explained why the Maine statute did not establish or require the maintenance of "an employee benefit *plan,*" *id.* at 12, 107 S.Ct. at 2218:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

*Id.* (footnote omitted).

Although there are factual differences between the statutorily required severance payments involved in *Fort Halifax* and the 60–day payments that Fleet proposed to make to its employees, the reasoning of *Fort Halifax* is equally applicable to the present case and requires the same conclusion: that Fleet's contemplated payments upon separation of its employees did not constitute an employee welfare benefit "plan."

Fleet's undertaking to give employees who stayed until the consolidation had been completed 60–days additional pay, like the severance pay involved in *Fort Halifax,* would occur over a short time and did not "require[ ] an ongoing administrative program to meet the employer's obligation." *Id.* at 11, 107 S.Ct. at 2217. Here, as in that case, "[t]he requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control." *Id.* at 12, 107 S.Ct. at 2218. The employee's option to receive the money in bi-weekly installments instead of in a lump sum did not change the basic situation.

The district court, in holding that the undertaking constituted a "plan," pointed out that "[e]mployees had different termination dates and different eligibility for receiving the payment; the payments had to be calculated individually and deductions for social security taxes, health and medical benefits, and 401k plans had to be made." Similar calculations would have been required, however, under the Maine statute involved in *Fort Halifax.* Fleet's need to make such simple arithmetical calculations did not require the "establish[ment of] a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits," *id.* at 9, 107 S.Ct. at 2216, the protection of which is the purpose of ERISA preemption.

In *Fort Halifax,* the Court stressed the contingent nature of the obligation the Maine statute imposed: the payment requirement would arise only if the employer closed the plant. The Court apparently deemed that fact significant as one reason why no ongoing administrative program by the employer was required to comply with the statute. Although the question in *Fort Halifax* was whether ERISA preempted the Maine statute, the case involved a state court suit by discharged employees of a closed plant against their former employer who had not made the severance payments the statute mandated.

In the present case, when Fleet undertook to give terminated employees 60–days additional pay, the termination of employment was definite, not contingent. The only question was when termination would occur. The certainty of termination of employment, however, does not distinguish this case from *Fort Halifax,* since, despite that certainty, the nature of the payments did not require an ongoing administrative employer program to effectuate them.

C. Fleet relies on our decision in *Gilbert v. Burlington Indus., Inc.,* 765 F.2d 320 (2d Cir.1985), *aff'd,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986). Although superficially *Gilbert* appears to support Fleet, closer analysis shows that the case does not deal with the question before us.

*Gilbert* involved an employer's program of giving severance pay to employees "involuntarily terminated" from the company. The company sold one of its divisions and employees of that division who continued to work for the new owners sued the original employer in state court for its failure to give them severance pay. This court held that the employer's unfunded severance pay policy constituted an "employee welfare benefit plan" under ERISA and that the statute, therefore, preempted the employees' state law claims.

In *Gilbert,* the issue was whether, as the employees and *amici* argued, "a promise or agreement to pay severance benefits, without more, does not constitute a welfare benefit plan within the meaning of ERISA." *Id.* 765 F.2d at 324. We concluded that "an unfunded severance pay policy is included within the definition of 'welfare plan,'" *id.* at 326, i.e., that a plan governing severance pay was one for employee welfare benefits. However, there was no issue in that case whether the employer's policy of making severance payments constituted a "plan" in the first place. The policy was set forth in a manual, not disclosed to employees, and, also, summarily described in an employee handbook. *Gilbert* was decided before *Fort Halifax,* and its general statements, quoted above, do not illuminate the different question before us, whether Fleet's undertaking to make payments to employees who served until the consolidation was completed, constituted a "plan" under ERISA.

*Gilbert* was one of the cases the Supreme Court cited in *Massachusetts v. Morash,* 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989), for its statement: "Thus, for example, plans to pay employees severance benefits, which are payable *only* upon termination of employment, are employee welfare benefit plans within the meaning of the Act." *Id.* at 116, 109 S.Ct. at 1673. In context, however, that seemingly broad statement meant only that severance payments were one of the kinds of benefits that an employee welfare benefit plan might cover. The issue in *Morash* was whether a company "policy of paying its discharged employees for their unused vacation time constitutes an 'employee welfare benefit plan,'" *id.* at 109, 109 S.Ct. at 1669, under ERISA. There is no question

that a program to pay severance benefits may constitute an "employee welfare plan." The issue in this case, however, which *Morash* did not address, is whether Fleet's particular undertaking to make such payments constituted a "plan."

D. In determining whether a program of employee severance payments constitutes an employee welfare benefit plan, some courts have applied a group of criteria which stresses, among other things, whether the making of the payments involves an exercise of managerial discretion. Thus, in *Bogue v. Ampex Corp.*, 976 F.2d 1319 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1847 (1993), the court held that a program to make severance payments to employees for whom a successor employer did not provide "substantially equivalent employment," *id.* 976 F.2d at 1321, was such a plan. It reasoned that the determination whether the employment with the successor was "substantially equivalent" to that with the predecessor "obligated" the employer "to apply enough ongoing, particularized, administrative, discretionary analysis to make the program in this case a 'plan'." *Id.* at 1323. The court stated its agreement with the approach for "describing the fence between cases involving real ERISA plans and cases such as *Fort Halifax*," *id.*, taken in *Fontenot v. NL Indus., Inc.*, 953 F.2d 960 (5th Cir.1992), by ascertaining "whether the plan in question require[s] an administrative scheme because the circumstances of each employee's termination [have to be] analyzed in light of [certain] criteria." *Bogue*, 976 F.2d at 1323 (internal quotation marks omitted) (quoting *Fontenot*, 953 F.2d at 962–63). In *Fontenot*, the court held that a "golden parachute" program providing severance payments to corporate executives terminated as the result of a corporate takeover was not a "plan" because it did not require an administrative scheme to meet the employer's obligation.

Even under the *Bogue* standard, however, Fleet's undertaking to give 60–days additional pay to its employees did not constitute an ERISA "plan." The simple arithmetical calculations and clerical determination that Fleet was required to make to ascertain each appellee's severance pay was a far cry from the "ongoing, particularized, administrative, discretionary analysis" required of the employer under the program involved in *Bogue. Id. See Wells v. General Motors Corp.*, 881 F.2d 166, 176 (5th Cir.1989), *cert. denied*, 495 U.S. 923, 110 S.Ct. 1959, 109 L.Ed.2d 321 (1990) ("procedure by which employees could elect to receive a one-time lump payment if they ceased working at the plant" not an ERISA "plan").

E. The result of the district court's decision in this case would be that even if Fleet's actions violated the employees' rights under state law (on which we, of course, intimate no views), the employees could not obtain any redress therefor. They could not prevail on their state law claims because ERISA preempts those claims; and they could not prevail on their ERISA claim because ERISA permits what Fleet did. It is difficult to believe that Congress, which enacted ERISA to protect employees' benefit rights, intended the preemption provision of that statute to produce such an anomalous result.

### III

The district court dismissed the ERISA count of the complaint (Count IV) on the ground that ERISA permitted Fleet to terminate any undertaking to make severance payments. It is unnecessary to consider James' challenge to that ruling, since our conclusion that Fleet's commitment to give 60–days additional pay did not constitute a "plan" under ERISA makes the statute inapplicable to those payments. We therefore affirm the dismissal of Count IV on the alternative ground that ERISA does not cover Fleet's refusal to make the payments. *See Chesley v. Union Carbide Corp.*, 927 F.2d 60, 68 (2d Cir.1991) (appellate court may affirm on any grounds for which there is record sufficient to permit conclusions of law, including grounds not relied upon by district court) (collecting cases).

### CONCLUSION

The judgment of the district court is reversed insofar as it dismissed Counts I–III of the complaint and the case is remanded to that court for further proceedings on those

counts. The judgment of the district court is affirmed insofar as it dismissed Count IV.