**Mary Lou McLEMORE, Plaintiff,**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY, Defendant.**

**Civ. A. No. 4:92–CV–0138(L)(C).**

United States District Court,
S.D. Mississippi, E.D.

June 11, 1993.

---

James M. Weems, Keith Raulston, Heidelberg & Woodliff, Jackson, MS, for plaintiff.

Brenda T. Redfern, Luther S. Ott, Ott, Purdy & Scott, Jackson, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendant United States Fidelity & Guaranty Company (USF & G) to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff Mary Lou McLemore has responded to defendant's motion and the court has considered the memoranda of authorities submitted by the parties in ruling on the motion.[1] For the reasons that follow, the court finds that defendant's motion to dismiss should be denied.

### FACTUAL BACKGROUND

Plaintiff, a former employee of USF & G, filed this action in the Circuit Court of Lauderdale County, Mississippi, asserting state law claims for fraud, misrepresentation and tortious breach of contract. Defendant subsequently removed the action to this court claiming both diversity and federal question jurisdiction.

As the basis for her claims against USF & G, plaintiff's complaint states that in April of 1991, USF & G announced that a reduction-in-force would take place at some unspecified time in the future and that the department in which she was employed would be affected. Plaintiff alleges that at the time of that announcement, USF & G distributed to her and other employees "workforce reduction guidelines" providing that if an employee was terminated pursuant to this reduction-in-force, the company would pay the employee a lump

---

1. Originally, there were thirty-eight plaintiffs who filed the present action against USF & G. Pursuant to an order dated January 5, 1993, all claims pending in this action were voluntarily dismissed with regard to all but one of the plaintiffs—Mary Lou McLemore. As such, McLemore is the only plaintiff now before the court on the motion to dismiss by USF & G.

sum severance payment and continue to provide certain benefits for the employee for a specified period of time. Specifically, in regard to severance pay, the guidelines distributed to plaintiff in April of 1991 provided:

> The Company will pay severance pay to employees who are being separated pursuant to this reduction in force.

> All regular employees over 20 hours per week on the payroll as of the separation date are eligible for severance pay.

> The Company will pay severance benefits using the following calculation based upon an employee's salary at the time of separation.

> A. All employees will receive eight weeks' pay in their severance checks.

> B. In addition, each employee will receive two weeks' severance pay for each completed year of service, calculated from the employee's most recent date of hire.

> 1. Employees with less than 12 months of service will receive two weeks' severance pay.

> 2. Employees will be paid for all service in excess of a full year, on a pro-rata basis.

> Payment will be made for any unused vacation days, floating holidays and personal days.

> Employees will receive severance in a lump-sum payment. Severance pay will be subject to local, state, and federal taxes.

> If a separated employee is eligible to retire now under the Company's Pension Plan, he or she will receive any severance pay due in a lump sum on the separation date.

According to plaintiff, upon distribution of these guidelines, and at subsequent times as well, USF & G, in order to induce her and other employees to remain employed until implementation of the reduction-in-force, offered to pay them the severance payment described in the 1991 guidelines regardless of whether they were actually terminated in 1991 or 1992. Relying on USF & G's representations in this respect, plaintiff chose to remain employed with USF & G throughout 1991, thus foregoing employment opportunities elsewhere.

In January of 1992, prior to plaintiff's termination from USF & G, USF & G changed its workforce reduction guidelines and eliminated the provision in the 1991 guidelines entitling terminated employees to "eight weeks' pay in their severance checks." According to plaintiff, USF & G did not provide her or any of the other employees with copies of the 1992 guidelines and, in fact, did not even inform them that any such "new guidelines" or changes in the original guidelines even existed. It was not until March of 1992, two months after the new guidelines were implemented, that plaintiff claims she was told of their existence.

■ On July 31, 1992, USF & G terminated plaintiff. USF & G refused to pay her the severance money provided in the 1991 guidelines. Rather, USF & G paid her an amount determined in accordance with the 1992 guidelines. Plaintiff, therefore, did not receive the eight weeks' pay to which she claims she is entitled as a result of USF & G's agreement and representations to pay her under the 1991 guidelines. In addition to seeking the amount of severance pay allegedly owed to her pursuant to the 1991 guidelines, plaintiff seeks both compensatory and punitive damages under her state law claims. USF & G maintains, however, that entitlement to severance pay benefits under its guidelines is governed exclusively by the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (ERISA). USF & G has thus moved for dismissal of plaintiff's state law claims on the ground that all such claims are preempted by federal law.[2]

## LEGAL ANALYSIS

■ Whether USF & G's "workforce reduction guidelines" are governed by ERISA turns on whether the guidelines constitute an "employee benefit plan" within the meaning of that Act. *See* 29 U.S.C. § 1003(a). Although severance pay plans may under cer-

---

2. ERISA preempts state laws that "provide an alternative cause of action to employees to collect benefits protected by ERISA." *Aetna Life Ins. Co. v. Borges,* 869 F.2d 142, 146 (2d Cir.), *cert. denied,* 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989).

tain circumstances constitute "employee benefit plan[s]" subject to ERISA, *see Massachusetts v. Morash*, 490 U.S. 107, 116, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989), the fact that USF & G's "workforce reduction guidelines" involve employee "benefits" does not necessarily mean that they are part of an employee benefit "plan," *see Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 7–8, 107 S.Ct. 2211, 2215, 96 L.Ed.2d 1 (1987).

In *Fort Halifax*, the Supreme Court held that an employee benefit "plan" encompasses only those benefits that require the establishment and maintenance of a separate and ongoing administrative scheme. *Id.* at 11, 107 S.Ct. at 2217. At issue in *Fort Halifax* was a Maine statute that required certain employers, on either the closing of a plant or upon relocation of a plant more than 100 miles away, to give terminated employees who had worked in the plant three or more years a severance payment of one week's pay for each year of employment. *Id.* at 5, 107 S.Ct. at 2214. The Court ruled that preempting the Maine statute "would not further the purpose of ERISA pre-emption," *id.* at 8, 107 S.Ct. at 2216, and that "the Maine statute in no way raises the type of concerns that prompted pre-emption," *id.* at 11, 107 S.Ct. at 2217. The Court noted that the goal of ERISA's preemption provision is to provide a single set of administrative practices for benefit plans in order to avoid a patchwork scheme of regulation.[3] However,

> [t]his concern only arises ... with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation. It is for this reason that Congress pre-empted state laws relating to plans, rather than simply *to benefits*. Only a plan embodies a set of administrative practices vulnerable

to the burden that would be imposed by a patchwork scheme of regulation.

*Id.* at 11–12, 107 S.Ct. at 2217.

The Court explained why the Maine statute did not establish or require the maintenance of "an employee benefit plan:"

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well never have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

*Id.* at 12, 107 S.Ct. at 2218 (footnote omitted).

In *Fontenot v. NL Industries, Inc.*, 953 F.2d 960 (5th Cir.1992), the Fifth Circuit dealt with a question closely related to that presented in *Fort Halifax*. *Fontenot* involved a severance pay plan which provided for a lump-sum cash payment "as well as a three year continuation of certain benefits" to executive employees terminated within two years of a change of corporate control. *Id.* at 961. The *Fontenot* court, relying pri-

---

3. The Court specifically stated as follows:

It is thus clear that ERISA's pre-emption provision was prompted by recognition that employers establishing and maintaining employee benefit plans are faced with the task of coordinating complex administrative activities. A patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from

adopting them. Pre-emption ensures that the administrative practices of a benefit plan will be governed by only a single set of regulations. See, *e.g.*, H.R.Rep. No. 93–533, p. 12 (1973), U.S.Code Cong. & Admin.News 1974, pp. 4639, 3650 ("[A] fiduciary standard embodied in Federal legislation is considered desirable because it will bring a measure of uniformity in an area where decisions under the same set of facts may differ from state to state.").

*Fort Halifax*, 482 U.S. at 11, 107 S.Ct. at 2217.

marily on *Fort Halifax,* held that the severance pay plan at issue in that case was not a "plan" within the meaning of ERISA. In so holding, the court emphasized that the one-time obligation of the employer to provide a severance payment to departing employees had not necessitated the creation of an ongoing administrative scheme and therefore had not implicated ERISA under the *Fort Halifax* test.

In this case, USF & G maintains that the reasoning of *Fort Halifax* and *Fontenot* is not applicable to the present case because there are factual differences between the severance payments involved in those cases and the "workforce reduction guidelines" at issue here. Specifically, USF & G argues that, unlike those cases, its plan for providing severance pay to terminated employees required an ongoing administrative scheme in that it was necessary to determine each individual employee's eligibility for receiving severance pay as well as the amount of severance pay to be given those eligible employees. These determinations, USF & G points out, were required to be made as each particular employee was terminated. USF & G further argues that the reasoning of the above cases should not be applied to the instant case because USF & G's guidelines addressed not only severance pay, but the continuation of certain other employee benefits as well, including medical insurance, dental insurance, pensions, and savings and investment plan participation. According to USF & G, the fact that its guidelines addressed far more than severance pay necessitates the establishment of a detailed scheme to administer such benefits.

Arguments similar to those urged by USF & G in this case were addressed in two recent circuit court cases also considering ERISA preemption as to employee claims for severance benefits, *James v. Fleet/Norstar Financial Group, Inc.,* 992 F.2d 463 (2d Cir. 1993), and *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530 (3rd Cir.1992). The question in *James* was "whether an employer's undertaking to give employees sixty days of severance pay following their last day of work if the employees would remain on the job until an internal consolidation was completed created an 'employee welfare benefit plan' under [ERISA]." *Id.* at 465. The district court held that the undertaking constituted a "plan" under the Supreme Court's decision in *Fort Halifax* since, in the court's opinion, the establishment of an ongoing administrative scheme was necessary for the employer to meet its payment obligations to the employees. In so holding, the district court noted that the basis for its holding was the fact that "'employees had different termination dates and different eligibility for receiving the payment; the payments had to be calculated individually and deductions for social security taxes, health and medical benefits, and 401k plans had to be made.'" *Id.* at 467. The Second Circuit concluded, however, that the existence of these factors was not controlling on the issue of whether an ERISA plan existed under the *Fort Halifax* test because "[s]imilar calculations would have been required ... under the Maine statute involved in [that case]." *Id.* at 467. Accordingly, the *James* court reversed the district court, finding that "[the employer's] need to make such simple arithmetical calculations did not require the 'establishment of a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits,' [*Fort Halifax,* 482 U.S.] at 9 [107 S.Ct. at 2216], the protection of which is the purpose of ERISA preemption." *James, supra* at 467.[4]

---

**4.** The *James* court went on to note that, "[i]n determining whether a program of employee severance payments constitutes an employee welfare benefit plan, some courts have applied a group of criteria which stresses, among other things, whether the making of the payments involves an exercise of managerial discretion." *James, supra* at 468 (citing *Bogue v. Ampex Corp.,* 976 F.2d 1319 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993)). At issue in *Bogue* was an employer's program to make severance payments to employees for whom a successor employer did not provide "substantially equivalent employment." *Bogue,* 976 F.2d at 1321. The Ninth Circuit, concluding that this constituted a "plan" governed by ERISA, reasoned that the determination whether the employment with the successor was "substantially equivalent" to that with the predecessor "obligated" the employer "to apply enough ongoing, particularized, administrative, discretionary analysis to make the program in this case a 'plan.'" *Id.* at 1323. Citing *Fontenot,* the

The *James* court further concluded that although the termination of employment was definite and not contingent in that case, which was contrary the situation involved in *Fort Halifax*, "[t]he certainty of termination of employment ... [did] not distinguish [the case before it] from *Fort Halifax*, since, despite that certainty, the nature of the payments did not require an ongoing administrative program to effectuate them." *Id.* at 467. In other words, though the employer's obligation in *James* was certain as opposed to contingent in nature, this fact alone did not compel a finding that an ERISA "plan" had been established in accordance with *Fort Halifax*.

■ As indicated above, USF & G asserts in the present case that, in contrast to the statutory payments at issue in *Fort Halifax*, the payments made pursuant to its guidelines required an ongoing administrative scheme since it was necessary to consider whether an employee was a "regular employee over 20 hours per week on the payroll as of the separation date;" how many years of service he or she had since the most recent date of hire; and whether or not he or she had any unused vacation days, floating holidays or personal days. USF & G further points out that the amount of severance pay then had to be calculated for each year of service, with added amounts for those vacation days, floating holidays and personal days, if any. Following the analysis set forth in *James*, however, this court finds USF & G's argument in this regard unpersuasive for the same reason expressed by the *James* court—i.e., similar calculations would have been required under the Maine statute involved in *Fort Halifax*. In the court's opinion, USF & G's need to make such simple arithmetical calculations and clerical determinations did not require the establishment of the type of ongoing administrative scheme which *Fort Halifax* directs is governed by ERISA.

As noted previously, USF & G also takes the position that because its workforce reduction guidelines did not merely address severance pay but rather provided for the continuation of other employee benefits as well, the reasoning of *Fort Halifax* and *Fontenot* does not apply to the present case. This aspect of USF & G's preemption argument was not present in *James*. However, the Third Circuit in *Angst, supra,* dealt with a similar "continuing benefits" type argument.

The court in *Angst* was called upon to consider whether or not ERISA preempted claims by employees for breach of a buyout plan under which an employer agreed to provide departing employees with a lump-sum cash payment and a year of continued benefits in exchange for their voluntary departure. It was the *Angst* court's treatment of the continuing benefits element of the buyout plan with which this court is now concerned. In this regard, the court held:

> As for the year of continued benefits, the district court in the present case found that "[t]o the extent the buyout plan required ongoing administration of benefits, that administration occurred pursuant to a duly constituted benefits plan that already

*Bogue* court stated that it agreed with the approach of "describing the fence between cases involving real ERISA plans and cases such as *Fort Halifax*" by ascertaining "whether the plan in question requires an administrative scheme because the circumstances of each employee's termination [have to be] analyzed in light of [certain] criteria." *Id. See also Pane v. RCA Corp.*, 868 F.2d 631 (3d Cir.1989); *Gray v. Quaker Fabric Corp.*, 809 F.Supp. 163 (D.Mass.1992); *Grun v. Pneumo Abex Corp.*, 808 F.Supp. 632 (N.D.Ill.1992); *Akau v. Tel–A–Com Hawaii, Inc.,* 1990 WL 49818 (D.Ha.1990).

In considering the case before it in light of *Bogue*, the *James* court stated:

> Even under the *Bogue* standard, ... [the defendant employer's] undertaking to give 60–days additional pay to its employees did not consti-

tute an ERISA "plan." The simple arithmetical calculations and clerical determination that [the employer] was required to make to ascertain each appellee's severance pay was a far cry from the "ongoing particularized, administrative, discretionary analysis" required of the employer under the program involved in *Bogue*.

*James, supra* at 468. *Cf. Harms v. Cavenham Forest Indus.,* No. 87–4068, 1990 WL 19821, 1990 U.S.Dist. LEXIS 2095 (E.D.La. Feb. 26, 1990) (ERISA plan found where "plaintiffs' entitlement to severance benefits was part of a comprehensive scheme designed to remedy various potential situations;" contained a "detailed scheme in which to determine the length of entitlement to severance benefits;" and contained "significant administrative provisions").

existed.... This factual determination by the district court was not clearly erroneous.... Because the buyout plan's provision of a year of continued benefits, like that plan's provision for a one-time lump-sum payment, did not require the creation of a new administrative scheme, and did not materially alter an existing administrative scheme, *Fort Halifax* instructs that the buyout plan did not implicate ERISA.

*Angst*, 969 F.2d at 1538–39. In reaching this decision, the *Angst* court discussed and relied upon the Fifth Circuit's decision in *Fontenot*:

[T]he *Fontenot* plan, like the [plan at issue here], provided for the "continuation of certain benefits." [*Fontenot* 953 F.2d] at 961. The *Fontenot* court did not discuss the "continuation" feature of the plan, obviously because the continuation of benefits would be administered under a pre-existing administrative scheme. Thus, as in the instant case, neither the one-time payment, nor the continuation of existing benefits, nor a combination of both, invoked the application of ERISA under the *Fort Halifax* test.

*Id.* at 1539.

In the instant case, it appears from the guidelines themselves that the additional benefits other than severance pay addressed therein were to continue being administered for a specified period of time under an ERISA-governed benefits plan that already existed. Indeed, references are made numerous times throughout the guidelines, to the "continuation" of "benefits" under the "existing Plan," the "current Plan," the "USF & G Plan" and the "Plan(s)." There are also references to specifically named plans such as, for example, the "Dental Plan." The guidelines at issue appear to address nothing more that at what point in time benefits available to employees under the existing plan(s) ceased after termination. As such, in the court's opinion, the continued disbursement of benefits under the guidelines did not require the creation of a new administrative scheme and did not materially alter an existing administrative scheme, but rather simply required the continuation of an existing procedure. The court therefore concludes that under the reasoning of *Angst*, which the court finds compelling, the continued benefits feature of USF & G's workforce reduction guidelines does not evidence an ERISA plan as measured by the test of *Fort Halifax*.

In sum, the court is of the opinion that the *James* and *Angst* decisions are persuasive authority on the issue presently pending before this court.[5] In accordance with these

---

5. USF & G has cited the Fifth Circuit case of *Whittemore v. Schlumberger Technology Corp.*, 976 F.2d 922 (5th Cir.1992), as support for its position that its guidelines constitute a "plan" within the meaning of ERISA. The plaintiffs in *Whittemore*, all former employees of Schlumberger, brought suit against the company for breach of an employment contract. Essentially, plaintiffs claimed denial of severance pay under a provision of the company's management policy manual that had provided for severance pay in lieu of notice of termination. The Fifth Circuit held that this severance pay plan was governed by ERISA. In so holding, the court distinguished both *Fort Halifax* and *Wells v. General Motors Corp.*, 881 F.2d 166 (5th Cir.1989), cert. denied, 495 U.S. 923, 110 S.Ct. 1959, 109 L.Ed.2d 321 (1990), by noting that the Schlumberger plan "was not created with a particular closing in mind and had been in existence for some time." *Id.* at 923. The court further stated that "the plan plainly required some sort of an administrative set-up in order to make payments to employees." *Id.*

The court is of the opinion that *Whittemore* does not support the finding of an ERISA plan in this case. The court would first note that USF & G itself maintains that upon implementation of the guidelines, it was an "absolute certainty" that some reduction-in-force, subject to the guidelines, would occur. As stated in USF & G's rebuttal brief: "[T]he guidelines were certain to be triggered. Some reduction-in-force was definite, predictable and certain...." In view of these statements, the court can reach no other conclusion but that in contrast to the Schlumberger plan at issue in *Whittemore*, which "was not created with a particular closing in mind," *id.*, USF & G's "workforce reduction guidelines" were created with particular employee terminations in mind. Moreover, again in contrast to *Whittemore*, the severance pay plan at issue here was not part of a "management policy manual" which "had been in existence for some time." *Id.* Rather, USF & G's guidelines consisted of an isolated document which was first implemented in 1991, not long before plaintiff's termination in 1992. Finally, though the *Whittemore* court stated that the Schlumberger plan required an administrative scheme just to make payments to employees, the court is of the opinion that, for the reasons discussed in the body of this opinion, this is at odds with *Fort Halifax*, *Fontenot* and *Wells*, all cases in which an ERISA "plan" was

authorities, the court concludes that under the test espoused in *Fort Halifax*, USF & G has not established that the "workforce reduction guidelines" at issue in this case is an ERISA "plan" which requires preemption of plaintiff's state law claims. Accordingly, USF & G's motion to dismiss is denied.[6]

---

not found despite the fact that the employer had to make severance payments to employees. *See, e.g., Wells*, 881 F.2d at 176 ("procedure by which employees could elect to receive a one-time lump sum payment if they ceased working at the plant" not an ERISA "plan"). For these reasons, the court concludes that *Whittemore* does not aid USF & G's position in this case.

**6.** The court would note that the motion before it is one for dismissal for failure to state a claim upon which relief can be granted. At this juncture, the court is unable to conclude based on the pleadings alone, including the workforce reduction guidelines which were attached as exhibits to plaintiff's complaint, that these guidelines constitute an ERISA "plan."