**Lu Ann WEISS, Plaintiff,**

v.

**NATIONAL WESTMINSTER BANK CORPORATION, Defendant.**

No. CV 94–1161.

United States District Court, E.D. New York.

April 25, 1996.

Gerald V. Dandeneau, Melville, New York, for Plaintiff.

Epstein, Becker & Green by Kenneth J. Kelly, New York City, for Defendant.

## ORDER

SPATT, District Judge.

This action was commenced by the plaintiff Lu Ann Weiss on March 14, 1994 alleging violations of the Employment Retirement Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") for denial of severance benefits, as well as state law claims for breach of contract. The defendant National Westminster Bank Corporation ("NatWest") moved the Court for an order dismissing the case for failure to state a cause of action, pursuant to Fed.R.Civ.P. 12(b)(6), and for lack of subject matter jurisdiction, pursuant to Federal Rule 12(b)(1). The federal jurisdictional basis of this action is ERISA. NatWest claimed that the severance benefits at issue here do not constitute an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002, so that there is no federal subject matter jurisdiction and no cause of action is stated.

In an Order dated March 16, 1995, the Court denied the defendant's motion to dismiss the action and stated that at that early stage of the proceedings, it was unable to determine whether the

facts of this case bring it within the holdings of *Fort Halifax* and *James,* so that the severance benefits at issue do not constitute an ERISA employee welfare benefit plan? Or are the facts of this case more analogous to those of *Gilbert* and its proge-

ny so that the severance benefits in question are subject to ERISA regulations? March 16, 1995 Memorandum Decision and Order at 9 (citing *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) and *James v. Fleet/Norstar Financial Group, Inc.,* 992 F.2d 463 (2d Cir. 1993)). Finding this question a "critical threshold matter in this action," the Court referred the issue to United States Magistrate Judge Viktor V. Pohorelsky to hold a hearing and prepare a report and recommendation.

On July 14, 1995 Judge Pohorelsky held a hearing at which one witness testified, namely, Richard Greco who serves in the position of vice president at NatWest's human resources division. On September 26, 1995, Judge Pohorelsky issued a report and recommendation that the "defendant's 'bridging pay' policy is an 'employee welfare benefit plan' within the meaning of the applicable sections of ERISA, and that the court accordingly has subject matter jurisdiction to determine this action." The defendant filed timely objections to the September 26, 1995 Report and Recommendation.

## DISCUSSION

### A. *Standard of review*

■ 28 U.S.C. § 636(b)(1) provides that upon timely objection to recommendations by a magistrate judge:

> [a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or remit the matter to the magistrate with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed.R.Civ.P. 72(b). The Second Circuit has stated that

> the statutory language of section 636(b)(1) affords the district court broad latitude in considering the magistrate's recommendation. Moreover, the phrase de novo *determination* in section 636(b)(1), as opposed to de novo *hearing,* was selected by Con-

gress "to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980). Section 636 does not require the district court "to rehear the contested testimony in order to carry out the required 'determination.' " *Id.* at 674, 100 S.Ct. at 2411.

*Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir. 1989). Furthermore, "the degree of deference given magistrate's recommendations is subject to the district court's discretion. *Id.* (citing *Raddatz,* 447 U.S. at 676, 100 S.Ct. at 2412).

Guided by these standards, the Court will conduct a de novo review of Judge Pohorelsky's report and recommendation.

### B. *NatWest's "bridging pay" policy*

The September 26, 1995 Report and Recommendation analyzed the facts and circumstances regarding the defendant's 'bridging pay' policy under the relevant cases discussing the scope of ERISA, including, *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) and *James v. Fleet/Norstar Financial Group, Inc.,* 992 F.2d 463 (2d Cir.1993). Judge Pohorelsky wrote that

> Both decisions [*Halifax* and *Fleet/Norstar*] turned on the fact that the severance pay programs under scrutiny were one-time payments provided to a circumscribed group of employees and triggered solely by the occurrence of a single, non-recurring event, as distinguished from an *ongoing* program of providing severance pay which is available generally to employees upon termination for a variety of reasons. As both decisions pointed out, in the former situation, " 'The employer assumes no responsibility to pay benefits on a regular basis and thus faces no periodic demands on its assets that create a need for financial coordination and control.' " *Fleet/Norstar,* 992 F.2d at 466, *quoting Fort Halifax,* [482 U.S. at 12] 107 S.Ct. at 2218. Thus, the focus on administrative

supervision in those cases was not on the quality or extent of such supervision, but rather on the fact that, because a plan covered by ERISA is ongoing, an employer has to establish some kind of administrative system to identify, on a recurring basis as employees are terminated, those who qualify for severance benefits and to keep track of the payment of those benefits. More importantly, the focus on administrative supervision in those cases was premised on the notion that the presence of such supervision is a bellwether for identifying a plan as an ongoing program in need of the protections of ERISA because it is likely to create "periodic demands on ... assets that create a need for financial coordination and control." *Id.*

Although "managerial discretion" did not figure prominently in the decision in either *Fort Halifax* or *Fleet/Norstar,* to the extent the latter case and other cases have addressed that issue the analysis was directed to the ultimate question of whether there was an ongoing program with an administrative scheme that required ERISA protection. Thus, to the extent that a particular plan involves the exercise of discretion, that is simply one indicator, among others, that a particular severance program requires an ongoing administrative scheme to accomplish its purpose. *See, e.g., Fleet/Norstar,* 992 F.2d at 468; *Bogue v. Ampex Corp.,* 976 F.2d 1319, 1322–23 (9th Cir.1992) (Wisdom, J.), *cert. denied,* [507 U.S. 1031] 113 S.Ct. 1847 [123 L.Ed.2d 471] (1993); *Fontenot v. NL Indus., Inc.,* 953 F.2d 960, 962 (5th Cir.1992).

NatWest's "bridging pay" policy is not at all similar to the programs in *Fort Halifax* and *Fleet/Norstar* which were held not to be "plans" within the meaning of ERISA. It is not triggered solely by the occurrence of a single event like a plant closing or a consolidation of operations. Nor is it limited to a select group of employees, but rather is generally available to all officers employed by the bank. Perhaps most importantly, it is an ongoing program which requires the bank to make coverage determinations and pay out benefits on a regular and recurring basis as employees are terminated. The adminis-

trative scheme for carrying out that program is an integral and regularized part of the separation process, and is incorporated in the bank's standard separation form which is completed for all employees who leave the bank. The scheme involves the exercise of discretion when the judgment is made at the time of separation as to the appropriate designation to give to the reason for the employee's termination. [footnote omitted]. The scheme further requires the bank's human resources generalist to take the administrative steps necessary to assure the proper implementation of bridging pay for those who are entitled to it. That the administration of the program thereafter is accomplished largely by computerized functions does not make it any less of an administrative scheme implementing an ongoing program for providing severance pay benefits.

Report and Recommendation at 5–7.

█ NatWest objected to Judge Pohorelsky's recommendation, arguing that the "bridging pay" policy did not involve an "ongoing, particularized, administrative discretionary analysis" to determine benefit eligibility and amount. *See Fleet/Norstar,* 992 F.2d at 468 (citing *Bogue v. Ampex Corp.,* 976 F.2d 1319). NatWest contends that eligibility determinations for benefits are based on stated criteria that are the same as those used for continued employment, that the payments do not require a separate administrative framework after the human resources administrator does the initial calculations and enters the instructions into the "payroll computer" and that the payments are merely short term (ranging from a few weeks to one year) salary payments without work, paid in the same manner as salary.

The Court agrees with the defendant that, based on the testimony and evidence, administration of the "bridging pay" policy is not as elaborate or complex as that required by some employee benefit plans. However, the benefit plan here does share characteristics with those found to be within the scope of ERISA. As Judge Pohorelsky noted, the "bridging pay" policy requires the availability of funds to be disbursed on an ongoing basis, which differs from the one-time obligations to

a discrete group of employees that the courts in *Fleet/Norstar* and *Fort Halifax* found did not constitute ERISA "plans." Further, the Court notes that the "bridging policy" resembles some benefits that were discussed in *Massachusetts v. Morash,* in that potential entitlement to the benefit may accumulate over a period of time and "either the employee's right to a benefit is contingent upon some future occurrence or the employee bears a risk different from his ordinary employment risk." *Massachusetts v. Morash,* 490 U.S. 107, 116, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989). Employees become eligible for the NatWest "bridging pay" benefit only after twenty-six years of service and, of course, only after termination. In *Morash,* the Supreme Court noted:

> Section 3(1) subjects to ERISA regulation plans to provide medical, sickness, accident, disability, and death benefits, training programs, day care centers, scholarship funds, and legal services. The distinguishing feature of most of these benefits is that they accumulate over a period of time and are payable only upon the occurrence of a contingency outside of the control of the employee. See 40 Fed.Reg. 24642 (1975). Thus, for example, plans to pay employees severance benefits, which are payable *only* upon termination of employment, are employee welfare benefit plans within the meaning of the Act. See *Holland v. Burlington Industries, Inc.,* 772 F.2d 1140 (CA4 1985), summarily aff'd *sub nom. Brooks v. Burlington Industries, Inc.,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986); *Gilbert v. Burlington Industries, Inc.,* 765 F.2d 320 (CA2 1985) summarily aff'd *sub nom. Roberts v. Burlington Industries, Inc.,* 477 U.S. 901 [106 S.Ct. 3267, 91 L.Ed.2d 558 (1986)].

*Id.,* 490 U.S. at 115–16, 109 S.Ct. at 1673–74.

In the Court's view, based on the applicable law, Judge Pohorelsky correctly reasoned and concluded that the NatWest "bridging pay" policy is an "employee welfare benefit plan" within the meaning of ERISA and that

this Court has subject matter jurisdiction to determine the claims raised in the plaintiff's complaint. Accordingly, the September 26, 1995 Report and Recommendation of Judge Pohorelsky is affirmed in all respects.

SO ORDERED.

### REPORT AND RECOMMENDATION

POHORELSKY, United States Magistrate Judge:

This matter has been referred to the undersigned for a report and recommendation regarding defendant's motion to dismiss this action on the ground that this court lacks subject matter jurisdiction. In essence, the defendant contends that the Employment Retirement Income Security Act ("ERISA"), the sole basis of federal jurisdiction, does not apply to the defendant's "bridging pay" policy that is at the core of the lawsuit. For the reasons set forth below, the undersigned reports and recommends that the defendant's "bridging pay" policy is an "employee welfare benefit plan" within the meaning of the applicable sections of ERISA, and that the court accordingly has subject matter jurisdiction to determine this action.

### FACTS

The plaintiff, Lu Ann Weiss, has brought this action to obtain severance pay to which she asserts she is entitled as a result of the termination of her employment by the defendant, National Westminster Bank USA ("NatWest" or "the bank"). At the time she was discharged, the plaintiff was an officer of the defendant, and was employed as Assistant Manager of a branch of NatWest located in Suffolk County.

Under bank policy, as articulated in the Employee Handbook and in the Human Resources Policy Guide, officers who are terminated involuntarily are eligible for severance pay, known as "bridging pay." [1] In essence, the bridging pay policy provides the terminated employee with payments in the same manner and at the same time as ordinary payroll checks until the employee obtains

---

**1.** The facts concerning the terms and administration of NatWest's bridging pay policy were adduced entirely through the testimony of Richard

Greco, a vice president of the bank employed in the human resources area, and various documentary exhibits introduced during his testimony.

new employment or until the employee's eligibility for bridging pay expires, whichever comes sooner. The length of time that a terminated officer is eligible for bridging pay is determined by a formula tied to the length of time the officer had been employed at the bank.

Not all officers who are involuntarily terminated, however, receive bridging pay. According to the bank's Human Resources Policy Guide,[2] "Employees who are discharged for cause, other than unsatisfactory performance (see Section 4.1), are usually not entitled to any special severance or bridging compensation." Defendant's Exhibit A, Section 9.3 at 3. Although the Guide provides various examples of reasons for involuntary termination, including staff reductions, excessive absenteeism, theft, and unsatisfactory performance, it does not define the word "cause" as it is used in the above quoted passage.

Once a determination is made that an employee or officer is to be terminated, a "generalist" from the bank's Human Resources department completes a form which is used by the bank to catalogue various post-termination administrative matters relating to the employee, including eligibility for bridging pay. See Defendant's Exhibit B.[3] In completing the form, which is done with the assistance of the employee's immediate supervisor, the generalist fills in a code which describes the reason for termination. According to the undisputed testimony of the defendant's witness, Mr. Greco, the process of filling in that code number is done without regard to eligibility for bridging pay. It is simply a function of finding the applicable number from a key, at the bottom of the form, which lists the various codes. Once the code is selected, however, the determination of whether, and for how long, the employee will receive bridging pay follows automatically. If the code number falls within that group of code numbers for which bridging pay is not allowed, the employee does not receive such pay. If the code number falls within that group for which bridging pay is

allowed, then the generalist determines how long the pay will be provided by making a simple calculation based on the employee's length of service. The generalist then enters the information regarding the duration of bridging pay on appropriate sections of the termination form, from which the information is in turn entered in the bank's computers. Thereafter, the computerized payroll system issues the bridging pay checks at regular payroll times along with the usual payroll checks until the bridging pay eligibility period expires or the bank receives notice that the employee has obtained employment elsewhere.

## OPINION

ERISA defines the term "employee welfare benefit plan" broadly:

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained . . . for the purpose of providing . . . (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title . . . .

29 U.S.C. § 1002(1). Section 186(c), in turn, describes numerous types of employee benefits including, specifically, severance pay. 29 U.S.C. § 186(c)(6). On its face then, NatWest's policy for providing post-termination payments constitutes severance pay and is therefore an employee welfare benefit plan within the meaning of ERISA.

NatWest argues, however, that recent Supreme Court and Second Circuit decisions have excepted some severance pay plans from ERISA coverage because they required no ongoing administrative supervision and involved no exercise of discretion in determining eligibility for coverage. NatWest contends that its "bridging pay" policy

---

2. The Guide is used by personnel departments and managerial employees. It is not provided to employees.

3. Defendant's Exhibit B is only that portion of the form which relates, in part, to severance pay.

should similarly be excepted from ERISA coverage because it too requires no ongoing administrative supervision or discretionary judgments.

As an initial matter, the two decisions on which the defendant principally relies, *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), and *James v. Fleet/Norstar Financial Group, Inc.*, 992 F.2d 463 (2d Cir.1993), do not rest solely on the absence of administrative supervision and discretionary analysis in determining that the severance pay policies under review in those cases were not covered by ERISA. In *Fort Halifax* the Supreme Court addressed a Maine statute that required employers to make a lump sum severance payment to all employees terminated because of a plant closing. The Court determined that the statute did not establish, and did not require the employer to maintain, an employee welfare benefit plan, and therefore was not preempted by ERISA. The Court focused on the word "plan" in making that determination, and, in that context, cited various reasons why a one-time, lump sum payment made on the occurrence of a single event, *i.e.*, plant closing, did not amount to a "plan." The Court concluded, "To do little more than write a check hardly constitutes the operation of a benefit plan. Once this · single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits." 482 U.S. at 12, 107 S.Ct. at 2218.

In the *Fleet/Norstar* case, the Second Circuit confronted an analogous situation where an employer had offered a one-time lump sum severance payment to a group of its employees as an inducement to continue working until the employer had completed a consolidation of operations that would result in the discharge of those employees. *Fleet/Norstar*, 992 F.2d at 464–65. Relying on *Fort Halifax*, the court found that such a program did not constitute a "plan," because it did not require an ongoing program for processing and disbursing severance pay benefits. *Id.* at 466–67.

Both decisions turned on the fact that the severance pay programs under scrutiny were one-time payments provided to a circumscribed group of employees and triggered solely by the occurrence of a single, nonrecurring event, as distinguished from an *ongoing* program of providing severance pay which is available generally to employees upon termination for a variety of reasons. As both decisions pointed out, in the former situation, " 'The employer assumes no responsibility to pay benefits on a regular basis and thus faces no periodic demands on its assets that create a need for financial coordination and control.' " *Fleet/Norstar*, 992 F.2d at 466, *quoting Fort Halifax*, 482 U.S. at 12, 107 S.Ct. at 2218. Thus, the focus on administrative supervision in those cases was not on the quality or extent of such supervision, but rather on the fact that, because a plan covered by ERISA is ongoing, an employer has to establish some kind of administrative system to identify, on a recurring basis as employees are terminated, those who qualify for severance benefits and to keep track of the payment of those benefits. More importantly, the focus on administrative supervision in those cases was premised on the notion that the presence of such supervision is a bellwether for identifying a plan as an ongoing program in need of the protections of ERISA because it is likely to create "periodic demands on ... assets that create a need for financial coordination and control." *Id.*

Although "managerial discretion" did not figure prominently in the decisions in either *Fort Halifax* or *Fleet/Norstar*, to the extent . the latter case and other cases have addressed that issue the analysis was directed to the ultimate question of whether there was an ongoing program with an administrative scheme that required ERISA protection. Thus, to the extent that a particular plan involves the exercise of discretion, that is simply· one indicator, among others, that a particular severance program requires an ongoing administrative scheme to accomplish its purpose. *See, e.g., Fleet/Norstar*, 992 F.2d at 468; *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1322–23 (9th Cir.1992) (Wisdom, J.), *cert. denied*, 507 U.S. 1031, 113 S.Ct. 1847,

123 L.Ed.2d 471 (1993); *Fontenot v. NL Indus., Inc.,* 953 F.2d 960, 962 (5th Cir.1992).

NatWest's "bridging pay" policy is not at all similar to the programs in *Fort Halifax* and *Fleet/Norstar* which were held not to be "plans" within the meaning of ERISA. It is not triggered solely by the occurrence of a single event like a plant closing or a consolidation of operations. Nor is it limited to a select group of employees, but rather is generally available to all officers employed by the bank. Perhaps most importantly, it is an ongoing program which requires the bank to make coverage determinations and pay out benefits on a regular and recurring basis as employees are terminated. The administrative scheme for carrying out that program is an integral and regularized part of the separation process, and is incorporated in the bank's standard separation form which is completed for all employees who leave the bank. The scheme involves the exercise of discretion when the judgment is made at the time of separation as to the appropriate designation to give to the reason for the employee's termination.[4] The scheme further requires the bank's human resources generalist to take the administrative steps necessary to assure the proper implementation of bridging pay for those who are entitled to it. That the administration of the program thereafter is accomplished largely by computerized functions does not make it any less of an administrative scheme implementing an ongoing program for providing severance pay benefits.

For the foregoing reasons, the undersigned reports and recommends that the "bridging pay" policy of NatWest is an "employee welfare benefit plan" within the meaning of ERISA and that the court accordingly has subject matter jurisdiction to determine the claims raised in the plaintiff's complaint.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within 10 days of the date of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72(b); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.) *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Serv.,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam).

Dated: Sept. 26, 1995

---

**4.** Although this decision may be made without consideration of how it affects bridging pay, it is a judgment that by its very nature involves the exercise of discretion and it undeniably has a direct impact on whether an officer receives, or (as in the present case) does not receive, bridging pay.