Steven R. **GRUENKE**, Richard J. Sytkowski, Kevin A. Welniak, Larry R. Sundem, Gregg A. Pederson, Tracy K. Coates, Cheryl A. Abellas, Cathy L. Alexander, Debra A. Criner, Jill A. Dunham, Gail W. Giles, Sinnie F. Goodman, William J. Hearney, Richard C. Maehr, Jr., Gary T. McCall and Rommel D. Mendoza, Plaintiffs,

v.

**MILES, INC., WELFARE PLAN**, Miles Inc., Benefit Plan Administrative Committee, Fred Salek and Hans Thieme, Defendants.

Civ. No. 4–93–1155.

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 18, 1995.

---

Robert D. Mehus, and Corporate Counsel Services, Ltd., Minneapolis, MN, for plaintiffs.

John J. Myers, and Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, and Steven R. Anderson, and Faegre & Benson, Minneapolis, MN, for defendants.

## ORDER

DOTY, District Judge.

Plaintiffs filed suit alleging that defendants violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., by denying them severance pay. Defendants move for summary judgment. Based on a review of the file, record and proceedings herein, and for the reasons stated below, the court grants defendants' motion.

## BACKGROUND

Plaintiffs are former employees of Four Star Photo ("Four Star"), a unit of the Agfa Division of Miles, Inc. Four Star operated film development centers on military bases in the United States. Plaintiffs were responsible for the daily operation of Four Star.[1] Prior to June 1991, Four Star was owned by Agfa Copal Inc., a joint venture between Agfa Corporation, a subsidiary of Bayer U.S.A., Inc., and Copal, Inc., a Japanese corporation. In June 1991, Agfa Copal, Inc. became a wholly owned subsidiary of Agfa Corporation; six months later Agfa Copal, Inc. merged into Agfa Corporation. Effective January 1, 1992, Agfa Corporation was merged into Miles, Inc.

In June 1991, a managers' meeting was held to discuss the planned merger of Agfa Copal and Agfa Corporation.[2] Hans Thieme ("Thieme"), the President of Agfa Copal, announced that Agfa's Minnesota operations would be relocated to Massachusetts and New Jersey. The managers were told that unspecified operations in Minnesota would be reorganized or eliminated. Although a reduction in force was anticipated, it was hoped that employees would be relocated to other jobs within Agfa. Thieme stated that employees who were laid off or who declined relocation would be paid some type of severance. Thieme said that the details of the severance package had not been determined. Thieme also indicated that an incentive would be offered to encourage employees to remain during the reorganization. Thieme stated that affected employees would receive letters prior to termination describing the details of the individual's severance package.

Plaintiff Steven Gruenke ("Gruenke"), who supervised Four Star's employees, attended the managers meeting. Gruenke testified that "it was mainly a general meeting to make you aware that they were going to start winding down the operation" and that Thieme "didn't go into any particulars." Gruenke also said that:

> [Thieme] didn't promise anybody any severance because he didn't know the particulars and that's where he says they would be getting back to the individuals as it would affect those people. So I guess no one knew what the situation was at that time.

Gruenke did not communicate Thieme's representations to other Four Star employees. Plaintiffs contend that Thieme's statements, along with other oral representations, established a severance plan enforceable under ERISA.

Prior to this time, neither Agfa Corporation or Agfa Copal had a severance program. In anticipation of the planned reduction in force, Agfa Corporation requested a severance pay policy from its parent company, Bayer U.S.A. Defendants informally adopted that policy for Agfa employees effective August 2, 1991. The 1991 policy afford-

---

1. Two of the plaintiffs operated the Minilab Supply Store ("Minilab"), a related business within the Agfa Division of Miles. Apparently all of the plaintiffs were regarded and treated as Four Star employees.

2. At this time defendants knew that Agfa Corporation would be merging into Miles, Inc. at the end of 1991.

ed severance pay to employees "whose employment is involuntarily terminated for other than for cause reasons such as, but not limited to, declining business conditions, position elimination, discontinuance/relocation of operations, or inability to meet the requirements of the job." The severance policy consisted of a minimum of four weeks pay plus two weeks pay for each year of service over three years. A severance pay schedule was attached to the policy. The 1991 policy provided:

> [T]he provisions in this policy will not apply in cases when:
>
> 1. There is a divestiture of all or part of the assets of the Company or the sale of all or part of the stock of a subsidiary of the Company (as a result of which the employee is employed by the acquiring company or an affiliate thereof or is offered employment which does not require the employee to relocate by such company or affiliate; provided, however, such employment must be at a wage or salary level equal to or greater than the employee's Bayer U.S.A. wage or salary level).

The 1991 policy also gave Agfa the right to amend or terminate the severance pay policy in the future. Defendants did not distribute the 1991 policy to employees.

The consolidation of Agfa Copal and the Photo Division of Agfa Corporation was revealed to employees in a memorandum from Thieme dated September 12, 1991. The memorandum indicated that some positions would be eliminated but that every effort would be made to place employees in other positions within Agfa. Thieme also said that if Agfa was "unable to find a mutually satisfactory alternative, Agfa [would] provide a full separation package." According to defendants, Four Star and its employees were not included in the consolidation because Agfa planned to sell Four Star. Defendants' intent, however, was not disclosed to Four Star's employees. A gradual reduction in force began on September 19, 1991. Employees whose positions were eliminated in the merger received letters specifying their last day of work and describing their severance package. Various employees were offered an additional six weeks pay to encourage them to remain during the reorganization.

Some of the plaintiffs attended an employees meeting held by Miles in June 1992.[3] Miles stated that more terminations would occur as a result of the consolidation but did not specify which positions, departments or divisions would be impacted. Miles said that employees who were laid off would be paid severance consisting of a minimum of four weeks pay plus two weeks pay for each year of service over three years. Miles also stated that an additional six weeks of pay would be offered to those employees who remained with Miles until their release date. Affected employees would receive notice of termination by letter at least two weeks prior to their termination. If two weeks notice was not provided the employee would receive an additional two weeks pay in lieu of notice.

For years, Agfa Corporation had considered selling Four Star but nothing materialized. In August 1992, Four Star's president, Dennis Hollstadt, told Gruenke that Miles intended to sell Four Star. Hollstadt invited Gruenke to purchase Four Star with him. Gruenke was interested and Hollstadt placed a bid with Miles. Hollstadt told Gruenke the offer had a good chance and was being considered by Miles. Rumors began to circulate among the employees that Four Star might be sold. After a few months, Hollstadt indicated that Miles probably would not sell Four Star. Hollstadt later told Gruenke that he alone was purchasing Four Star from Miles and Gruenke would not be involved in the sale.

On November 30, 1992, Four Star Mini-Labs, Inc. ("FSML"), a corporation created by Hollstadt, agreed to purchase Four Star and Minilab from Miles each for $300,000. The Asset Purchase Agreement ("APA") required FSML to employ Four Star's employees at the same rate of pay with carryover seniority.[4] FSML was also required to fur-

---

3. Effective January 1, 1992, Agfa Corporation merged into Miles, Inc.

4. Section 3.1.5 states that "Schedule 3.1.5 to this Agreement contains a complete list of all employees of 4 Star." Section 7.3 of the APA required

nish medical insurance. On December 19, 1992, plaintiffs learned that Miles was selling Four Star to Hollstadt. Three days later Miles and FSML signed the APA. The actual transfer occurred at closing on December 22, 1992, although the transferred assets and liabilities were valued on November 30, 1992, the effective date of the sale. All of the plaintiffs were employed by FSML, without interruption, in the same positions and performed similar duties. Plaintiffs received the same annual pay but the commissions and fringe benefits offered by FSML, which did not include a severance policy, pension benefits or a 401K plan, did not match those provided by Miles.[5]

Plaintiffs' participation in the 401K plan and pension benefits provided by Miles ceased on November 30, 1992. Miles subsequently paid plaintiffs their accrued vacation benefits and the present day value of their pension benefits through November 30, 1992. Although FSML was obligated under the APA to provide medical benefits, it had not acquired medical insurance by the closing date. Miles provided continuation coverage under its medical plan and FSML paid Miles for the insurance costs as of December 1, 1992. FSML also paid Miles for the payroll costs of Four Star's employees between November 30 and December 22, 1992. In January 1993, Miles issued COBRA letters stating that plaintiffs were no longer employees of Miles as of November 30, 1992, and were eligible to continue their medical benefits for 18 months through COBRA.[6]

Defendants insist that plaintiffs' employment with Miles ended and began with FSML when the sale closed on December 22,

1992. Effective December 1, 1992, Miles adopted a formal severance pay plan applicable to all divisions, including the Agfa Division. The 1992 plan affords severance benefits upon instances of "involuntary termination" similar to those set forth in the 1991 policy. The 1992 plan also provides:

> A Severed Employee will not be eligible for a severance benefit under this Plan if his or her employment with an Employer terminates for one of the following reasons:
>
> \*      \*      \*      \*      \*      \*
>
> (8) In connection with a divestiture of all or part of the assets of an Employer or the sale of all or part of the stock of an Employer, as a result of which as of the date of sale the Severed Employee (i) is employed by the Acquiring Entity or an affiliate of the Acquiring Entity, or (ii) is offered employment by the Acquiring Entity or an affiliate of the Acquiring Entity which offered employment (a) does not require the Severed Employee to Relocate and (b) is at a wage or salary level (determined without regard to employee benefits offered by either the Employer, the Acquiring Entity or the affiliate of the Acquiring Entity) equal to or greater than the Severed Employee's wage or salary level at the Employer on his Employment Severance Date.

A summary plan description was distributed to employees sometime after December 22, 1992.[7] Miles did not provide plaintiffs with a written summary of the 1992 plan until months after the sale of Four Star. Defendants contend that plaintiffs' entitlement to

---

FSML to offer "employment to each employee of 4 Star listed in Schedule 3.1.5" under the terms described above. Whether by design or oversight, Schedule 3.1.5 did not include six of the plaintiffs. The omission appears to be an oversight given the evident intent of the APA and the fact that FSML hired all of Four Star's employees whether or not they were listed in Schedule 3.1.5. The reason for the omission, however, does not impact the court's ultimate decision in this case.

**5.** Gruenke was terminated from FSML on March 10, 1993. FSML did not have a severance policy and Gruenke received no severance pay. Tracy Coates was also terminated in March 1993.

**6.** COBRA is the acronym for the Consolidated Omnibus Budget Reconciliation Act. The COBRA notification letters stated that "[a]s a result of the Four Star Photo sale, effective 11–30–92, you are no longer an employee of Agfa Division of Miles."

**7.** The summary plan description provides that employees will not be eligible for benefits if "[t]he division of the company you work for ... is sold or divested and you either automatically become an employee of the new owner, or if the new owner offers you continuing employment in a comparable position (even if you choose not to accept it)."

severance pay should be determined under the 1992 plan because it was in effect on December 22, 1992.

In May 1993, plaintiffs submitted claims to Miles for severance pay and incentive payments. Plaintiffs asserted that two former employees, Kathy Nistler ("Nistler") and Tom Swan ("Swan"), received severance pay and incentive payments even though they were immediately employed by FSML. Miles concluded that plaintiffs were ineligible for severance pay under section 3.06(8) of the 1992 plan because they were employed by FSML as a result of the asset sale. Miles also noted that plaintiffs would not be entitled to severance pay under the 1991 policy. Miles explained that Nistler and Swan were accounting employees of Agfa Copal on loan to Four Star who were laid off when their positions were eliminated on December 31, 1992, as a result of the merger. Miles noted that Swan's and Nistler's subsequent employment with FSML did not alter their right to severance pay. Plaintiffs appealed the denial to the Miles, Inc. Benefit Plan Administrative Committee ("Committee").

After reviewing the record, the Committee affirmed the denial of severance benefits and incentive payments. Relying on the effective date of the APA and the date specified in the COBRA letters, plaintiffs asserted that November 30, 1992, was the applicable termination date. The Committee, however, fixed the termination date at December 22, 1992, and applied the 1992 plan to plaintiffs' claims for severance benefits. The Committee stated:

> Until December 22, the Four Star Photo employees continued to report to Miles' management, and remained under Miles' direction and control. They remained on Miles' payroll and subject to its policies and procedures. Miles remained vicariously liable for their actions. In all relevant respects, they remained Miles' employees. Although it is feasible and common to make financial and accounting adjustments retroactively, one cannot retroactively change the fact that these people indeed worked for Miles until December 22, 1992. It follows, therefore, that the Plan which took effect on December 1 is

the severance arrangement which is applicable to [plaintiffs'] claims.

The Committee found that plaintiffs were not entitled to severance pay because they were immediately employed by FSML as of the date of sale.

The Committee also noted that it would deny the claims under the 1991 policy. The 1991 policy did not provide for severance pay where the employee was employed by the acquiring entity "at a wage of salary level equal to or greater than the employee's Bayer USA wage or salary level." The Committee concluded that the phrase "wage or salary level" meant the employee's fixed, annual pay and did not include the value of the employee's total compensation and fringe benefit package. Under this definition, plaintiffs were not entitled to severance pay.

Finally, the Committee refuted the argument that Nistler's and Swan's receipt of severance pay reflected an inconsistent reading or application of the plan. The Committee found that Nistler and Swan were laid off as a result of the Agfa merger and, therefore, were not similarly situated to plaintiffs. The Committee stated that:

> The most important distinction is that [plaintiffs] were never at risk of losing their jobs because they were protected by the Asset Purchase Agreement, whereas these two individuals, like others in the Agfa–Copal organization, were not protected. Four Star Mini–Labs, Inc. chose to hire Ms. Nistler and Mr. Swan, but need not have done so.

The Committee also rejected plaintiffs' claims for incentive payments, concluding that Four Star employees were never at risk of termination and had never been offered a retention incentive.

Plaintiffs filed this action to recover benefits they assert are due to them under the alleged oral severance plan. In addition to the representations made at the meetings, plaintiffs claim that throughout the reorganization defendants indicated that employees would be better off as part of a larger company and would have better benefits. Plaintiffs also contend they remained at Four Star with the expectation of receiving severance pay as well as incentive payments. Plaintiffs

insist that their termination date was November 30, 1992, and that the oral severance plan governs their entitlement to severance pay. Plaintiffs also assert claims for breach of fiduciary duty. Defendants respond that plaintiffs' entitlement to severance pay should be determined under the 1992 plan because it was in effect on December 22, 1992. Defendants move for summary judgment arguing that the court must defer to the Committee's decision.

## DISCUSSION

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510–11.

On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

## I.

■ As a threshold matter, the parties dispute what standard of review the court should apply. Plaintiffs urge the court to conduct a *de novo* review; defendants, on the other hand, contend that the court can review only for abuse of discretion. A deferential standard of review is applied if the plan gives the administrator discretionary authority to interpret the terms of the plan or to decide disputed eligibility questions. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). When such discretion is lacking, the court undertakes a *de novo* review of the plan's terms and other manifestations of the parties' intent. *Id.* at 113, 109 S.Ct. at 955–56.

The 1992 severance pay plan expressly gives the Committee discretion to determine eligibility for benefits and to construe and interpret plan terms. The court, therefore, applies a deferential standard of review when analyzing the denial of plaintiffs' severance pay claims under the 1992 plan. The other plans described by the parties, however, did not confer any discretionary authority on the Committee. Accordingly, the denial of plaintiffs' claims for benefits under those plans are reviewed by the court *de novo*.

This case involves a dispute over entitlement to severance pay. Thus, regardless of the applicable standard of review, the plans must be accorded their natural construction and interpreted to comport with the purpose of severance pay plans generally. Plaintiffs contend that the purpose of defendants' severance pay policies was to reward employees for past services regardless of the circumstances surrounding their termination. It is apparent, however, that the foremost purpose of defendants' severance plans is to provide employees with a buffer against the economic hardship that often accompanies

layoffs. *See, e.g., Allen v. Adage, Inc.*, 967 F.2d 695, 702 (1st Cir.1992).

## II.

■ Plaintiffs challenge the Committee's decision to fix their termination date at December 22, 1992. Relying on the effective date of the APA and the date specified in the COBRA letters, plaintiffs assert they were terminated by Miles on November 30, 1992. Plaintiffs contend that defendants cannot select a different date for determining severance eligibility. There is some support in the record for the date advocated by plaintiffs. FSML repaid Miles for the payroll costs of Four Star's employees between November 30 and December 22, 1992. After the sale, Miles provided continuation coverage for plaintiffs under its medical plan and FSML reimbursed Miles for insurance costs as of December 1, 1992. Plaintiffs' participation in the 401K plan and pension benefits provided by Miles ceased on November 30, 1992. Miles later paid plaintiffs their accrued vacation benefits and their pension benefits through November 30, 1992.

Defendants insist that plaintiffs' employment with Miles terminated and began with FSML when the actual transfer occurred and the sale closed on December 22, 1992. Defendants contend that the effective date of November 30, 1992 was fixed primarily for accounting and financial reasons. The transferred assets and liabilities were valued on that date; events occurring between the effective date and the closing resulted in accounting adjustments to the purchase price. Defendants also note that until the sale closed, plaintiffs were managed and paid by Miles and Miles was vicariously liable for their actions.

Both positions advanced by the parties are plausible. On the one hand, it seems arbitrary for defendants to pick and choose different termination dates for different benefits. On the other hand, the December 22, 1992 termination date comports with the reality of the situation. It is common for the valuation date to precede the closing date. No transfer occurred on November 30, 1992, however, and there remained a possibility that the deal would not close. Nothing transpired until the conditions in the APA were met, the APA was signed and the deal was concluded. As the Committee aptly noted "one cannot retroactively change the fact that [plaintiffs] indeed worked for Miles until December 22, 1992."

More important, however, is the fact that welfare benefits, including severance, do not vest like pension benefits but are contingent and unaccrued. Thus, the severance plan applicable to plaintiffs is the one in effect when their alleged right to severance vested. Any right of plaintiffs to severance pay was not fixed as of November 30, 1992. The right to severance claimed by plaintiffs was not triggered and did not vest until they were terminated from Miles on December 22, 1992. Plaintiffs could not assert a claim for severance pay before that date.

### 1. Application of 1992 Plan

■ The 1992 plan affords severance benefits to employees involuntarily terminated due to reasons such as declining business conditions, position elimination or discontinuance/relocation of operations. The 1992 plan also provides that an employee is not eligible for severance if his or her employment with Miles terminates:

> In connection with a divestiture of all or part of the assets of an Employer or the sale of all or part of the stock of an Employer, as a result of which as of the date of sale the Severed Employee (i) is employed by the Acquiring Entity or an affiliate of the Acquiring Entity, or (ii) is offered employment by the Acquiring Entity or an affiliate of the Acquiring Entity which offered employment (a) does not require the Severed Employee to Relocate and (b) is at a wage or salary level (determined without regard to employee benefits offered by either the Employer, the Acquiring Entity or the affiliate of the Acquiring Entity) equal to or greater than the Severed Employee's wage or salary level at the Employer on his Employment Severance Date.

The Committee found that all of the plaintiffs fell within this exclusion because they were employed by FSML as of December 22, 1992, the date of sale.

By its plain language and evident intent, the 1992 plan does not entitle plaintiffs to severance pay. Plaintiffs were not laid off as part of a reduction in force. Rather, their employment with Miles was terminated due to the sale of Four Star and Minilab to FSML. All of the plaintiffs were immediately employed by FSML, the acquiring entity. Plaintiffs concede they were employed by FSML, without interruption, in similar positions and received the same annual pay. They contend, however, that they are entitled to severance pay because their employment with FSML did not include benefits commensurate with those provided by Miles and, therefore, was not at an equal or greater wage or salary level. This interpretation is not supported by the plan. The language relied on by plaintiffs relates only to offered employment; it does not pertain to actual employment with the acquiring entity.

Plaintiffs allege that the denial of their severance claims was arbitrary and capricious because Miles paid severance to other similarly situated employees. Plaintiffs argue the payment of severance pay to Kathy Nistler and Thomas Swan reflects an inconsistent interpretation or application of the 1992 plan. Plaintiffs contend that Nistler and Swan were similarly situated employees who received severance pay even though they were immediately employed by FSML. Plaintiffs maintain that it was arbitrary and capricious for the Committee to read the 1992 plan to afford Nistler and Swan severance pay and to deny plaintiffs severance based on their employment with FSML.

The Committee found that Nistler and Swan were not Four Star employees but were accounting employees of Agfa Copal who were assigned to assist Four Star when one of its employees resigned.[8] Nistler and Swan remained on Agfa Copal's payroll and, in addition to performing services for Four Star, continued to perform some duties for Agfa Copal. Nistler and Swan were not among the employees FSML agreed to employ under the terms of the APA. The Committee said the "most important distinction" was that plaintiffs, unlike Nistler and Swan, were never at risk of losing their jobs. The Committee concluded that Nistler and Swan were laid off as a result of the Agfa merger and, thus, were not similarly situated to plaintiffs.

The distinction drawn by the Committee is reasonable and consistent with the 1992 plan. Nistler and Swan were terminated by Miles on December 31, 1992, when their positions were eliminated as part of a reduction in force. In contrast, plaintiffs' employment with Miles ended in connection with the sale of Four Star's assets and stock to FSML. Under the plan language, plaintiffs are not entitled to severance pay due to their employment with FSML. The court recognizes that FSML employed Nistler and Swan in similar positions, without interruption, at the same rate of pay with carryover seniority for purposes of vacation benefits. The fact that Nistler and Swan obtained employment with FSML, however, does not alter their right to severance pay. *See Simmons v. Diamond Shamrock Corp.*, 844 F.2d 517, 524 (8th Cir. 1988) (reasonable to exclude employees from severance pay in a divestiture situation where employer knows the employees will receive immediate offers of employment).[9]

The court concludes there was a reasonable basis for the Committee's denial of plaintiffs' claims for severance benefits. The court notes that the Eighth Circuit has frequently held that terminated employees are not entitled to severance benefits if they are immediately rehired under comparable terms by a successor employer. *Lakey v. Remington Arms Co., Inc.*, 874 F.2d 541 (8th Cir. 1989); *Agee v. Armour Foods Co.*, 834 F.2d 144 (8th Cir.1987); *Acton v. Tosco Corp.*, 815 F.2d 1161 (8th Cir.1986); *Pabst Brewing Co. v. Anger*, 610 F.Supp. 214 (D.Minn.1985), *aff'd*, 784 F.2d 338 (8th Cir.1986). Having concluded that the 1992 plan applies to plaintiffs' claims for severance and that they are not entitled to severance pay under that plan, the court need go no further on the issue of

---

8. Nistler and Swan had worked as accounting assistants at Agfa's office in Plymouth, Minnesota since 1987. They were assigned to Four Star in February or March 1992.

9. *Accord Bradwell v. GAF Corp.*, 954 F.2d 798, 800 (2d Cir.1992) (employees kept on by a successor are in a different position from those who are laid off but find employment).

severance. However, because the Committee discussed alternative grounds for its denial of plaintiffs' claims, the court believes it is appropriate to address plaintiffs' remaining contentions.

### III.

■ Plaintiffs assert that Thieme's statements at the June 1991 managers meeting created an informal severance plan enforceable under ERISA.[10] In ERISA cases, the existence of an employee benefit plan is integral to the merits of a claim for benefits. The court must first determine whether there is a "plan" before considering the applicability of ERISA. To determine if a plan, written or not, is a reality, " 'a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.' " *Harris v. Arkansas Book Co.*, 794 F.2d 358, 360 (8th Cir.1986) (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982)). The mere decision to provide benefits is not actionable. Rather, "[i]t is the reality of a plan, fund, or program and not the decision to extend certain benefits that is determinative." *Donovan*, 688 F.2d at 1373.[11] Moreover, for a plan to exist, the employer must intend for it to be in effect, and not just be something for future adoption.

The statements made by Thieme at the meeting do not constitute a severance plan under ERISA. Thieme indicated that employees who were laid off or who declined relocation would receive some type of severance that had yet to be determined. He also said that some incentive would be offered to encourage employees to remain during the transition. Thieme merely apprised managers of what they might expect once the reorganization began. He did not promise any severance payments, offer specific details or announce a formula for determining severance payments. The court finds that

Thieme's representations were merely statements of defendants' future intentions regarding severance pay and do not comprise a welfare benefit plan enforceable under ERISA. *See, e.g., Elmore v. Cone Mills Corp.*, 23 F.3d 855, 861–62 (4th Cir.1994).

### IV.

The court next considers the severance policy which was informally adopted by defendants effective August 2, 1991. The 1991 policy was established and maintained by defendants for the purpose of providing severance benefits to employees. The policy specifies the participants, establishes eligibility requirements and provides a formula for calculating severance benefits. No written summary of the plan was distributed but employees were told of the severance policy and its key terms. Based on the totality of the circumstances, the court concludes that the 1991 policy constitutes a welfare benefit plan governed by ERISA.

Plaintiffs assert that the 1991 policy was never established or maintained by defendants. Instead, according to plaintiffs, until December 1992 defendants used the oral severance plan described by Thieme. The court has already concluded that Thieme's statements did not create an enforceable severance plan. In addition, the record does not support plaintiffs' contention. No severance benefits were paid to employees prior to the effective date of the 1991 policy. Agfa's reduction in force began on September 19, 1991. The severance benefits paid by defendants between September 1991 and November 1992 corresponded to the terms of the 1991 policy.

### 1. Procedural Violations

■ Defendants concede they did not comply with ERISA's reporting and disclosure requirements. ERISA imposes certain obligations upon administrators of welfare benefit plans, although they are less rigorous than

---

**10.** Plaintiffs assert that the oral plan exists independent of the letters sent by Miles to various employees. Plaintiffs maintain that the letters are evidence of the plan terms and were sent as promised in the oral plan.

**11.** *Accord Kulinski v. Medtronic Bio–Medicus, Inc.*, 21 F.3d 254, 256 (8th Cir.1994); *James v. National Business Sys., Inc.*, 924 F.2d 718, 720 (7th Cir.1991); *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1504 (9th Cir.1985).

those imposed on administrators of employee benefit plans. Welfare benefit plans, including severance plans, are subject to the reporting and disclosure requirements of §§ 1021–1031, and the fiduciary responsibility standards of §§ 1101–1114. *Anderson v. John Morrell & Co.*, 830 F.2d 872, 876 (8th Cir.1987). ERISA requires employers administering welfare benefit plans to provide employees with a written summary plan description that reasonably apprises employees of their rights and obligations under the plan. 29 U.S.C. § 1022(a)(1).

Defendants admit, as they must, that they failed to distribute a written summary of the 1991 policy to employees.[12] However, defendants did describe the main components of the 1991 policy in various employee meetings. Defendants stated that employees who were laid off would be paid severance consisting of a minimum of four weeks pay plus two weeks pay for each year of service over three years. Defendants also said that affected employees would receive notice of termination by letter at least two weeks prior to their termination; if such notice was not provided the employee would receive an additional two weeks pay.[13] Although layoffs were mentioned in connection with payment of severance, defendants failed to explain that employees would not be eligible for severance benefits if their unit was sold and they were immediately employed by the new owner.

Plaintiffs maintain that defendants actively concealed the 1991 policy and refused to provide information concerning severance when requested. Plaintiffs contend that defendants' failure to comply with ERISA's procedural requirements precludes enforcement of the 1991 policy. They also assert that the violations render any denial of severance pay under the 1991 policy arbitrary and capricious. Plaintiffs rely on *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88

L.Ed.2d 152 (1985). In *Blau*, the employer had a secret severance policy which it actively concealed and did not inform employees in any way of its existence, content or terms.[14] The Ninth Circuit held that the employer's procedural violations rose to such a level that they rendered the denial of severance benefits arbitrary and capricious.

The 1991 severance policy, although not distributed to employees, was not clandestine. While employees were not apprised of the exceptions to severance pay, defendants informed employees of the severance policy, its purpose and its terms. The court does not condone defendants' failure to comply with ERISA's procedural requirements. The procedural violations in this case, however, did not result in substantial harm and fall short of the level of violations demonstrated in *Blau*. The instant case is more akin to *Pabst* where the court held that the employer's technical non-compliance with ERISA's reporting and disclosure requirements was not arbitrary and capricious behavior. The reasoning of *Pabst* applies here. Accordingly, the court concludes that defendants' violations of ERISA's procedural requirements neither render the 1991 policy void nor warrant a finding that the denial of severance benefits under that policy was arbitrary and capricious.

**2. Application of 1991 Policy**

■ The 1991 policy affords severance benefits upon instances of involuntary termination similar to those set forth in the 1992 plan. The 1991 policy also provides that an employee is not eligible for severance if:

> There is a divestiture of all or part of the assets of the Company or the sale of all or part of the stock of a subsidiary of the Company (as a result of which the employee is employed by the acquiring company or an affiliate thereof or is offered employment which does not require the employee

---

**12.** Defendants claim the 1991 policy was not formally disseminated because new employee benefit plans were to be adopted after the planned merger with Miles, Inc.

**13.** It was also stated that incentive pay of six additional weeks would be offered to encourage employees to remain during the reorganization.

**14.** Moreover, in *Blau*, the employer applied the policy in a discriminatory manner and failed to respond to employees' claims for severance pay.

to relocate by such company or affiliate; provided, however, such employment must be at a wage or salary level equal to or greater than the employee's Bayer U.S.A. wage or salary level).

It is undisputed that plaintiffs were employed by FSML in similar positions and received the same annual or hourly pay. The benefits offered by FSML, however, did not match those provided by Miles. Plaintiffs assert that they are entitled to severance under the 1991 policy because FSML did not offer identical benefits and, therefore, the employment was not at an equal or greater wage or salary level.

Plaintiffs contend that the terms "wage" and "salary" are ambiguous because they are not defined in the 1991 policy and are susceptible to more than one interpretation. Defendants respond that the language relied on by plaintiffs relates only to offered employment. Defendants also contend that the terms are not ambiguous and refer to the employee's fixed, annual pay but do not include the value of the employee's total compensation and fringe benefit package. The Committee, agreeing with defendants' latter position, concluded that plaintiffs were not entitled to severance pay under the 1991 policy.

The court reviews the denial of severance benefits under the 1991 policy *de novo*. As the issue is simply one of contract interpretation, the court begins with the language of the plan. The court rejects defendants' argument that the language relied on by plaintiffs relates only to offered employment. While such an interpretation is plausible, it is not the most natural reading of the plan language. Turning to the disputed language, the court must determine whether the terms "wage" and "salary" were used in their usual sense or, as plaintiffs assert, mean something more.

Without deferring to either party's interpretation, the court concludes that no ambiguity arises from the use of the terms "wage" and "salary" in the 1991 policy. There are no conflicting uses of "wage" or "salary" in the 1991 policy. Because the 1991 policy provided no special definition of the terms "wage" or "salary," the court gives the terms their ordinary meaning. *Accord La Societe Generale Immobiliere v. Minneapolis Community Dev. Agency*, 44 F.3d 629, 636–637 (8th Cir.1994). Neither term as ordinarily used includes the value of fringe benefits. Instead, wage refers to money paid, usually on an hourly basis, for labor or services and salary means fixed compensation regularly paid for work. Because plaintiffs received the same wage or salary when employed by FSML, the court concludes that they are not entitled to severance benefits under the 1991 policy.

Plaintiffs argue that because severance pay under the 1991 policy is calculated on the employee's base pay and the phrase "base pay" is defined in the employee handbook, the lack of a definition renders the terms "wage" and "salary" ambiguous. The court disagrees. The fact that defendants gave certain terms special definitions supports the conclusion that terms in the 1991 policy should be given their ordinary meaning unless otherwise defined. Plaintiffs also contend that the 1991 policy cannot be read to afford Nistler and Swan severance pay and to deny plaintiffs severance based on their employment with FSML. Applying a plenary standard, the court rejects this argument for the same reasons as stated above in connection with the 1992 plan.

## V.

Plaintiffs contend they are entitled to two weeks pay because Miles did not give them advance notice of their termination. Two weeks pay in lieu of notice is available only to employees who are entitled to severance pay. Section 3.07 of the 1992 plan states that two weeks notice or pay in lieu of notice must be given to "[a]n employee whose employment is about to be terminated in a manner which would cause the employee to receive a severance benefit under this plan[.]" The 1991 policy also states that two weeks notice or pay in lieu of notice must be given to "employees affected by this policy." Having concluded that plaintiffs are not eligible for severance pay under the 1992 plan or the 1991 policy, the court holds that plaintiffs are not

entitled to receive two weeks pay in lieu of notice of termination.

Plaintiffs also seek to recover COBRA payments they allegedly incurred to maintain medical insurance under COBRA.[15] The 1992 plan and the 1991 policy provide for the continuation of various employer-provided benefits during the severance pay period. Under both plans, however, employees are entitled to continuation of medical benefits only if they are eligible for severance pay in the first place. Accordingly, plaintiffs' claim for recovery of COBRA payments fails as they were not entitled to continuation of medical insurance under either the 1991 policy or the 1992 plan.

## VI.

Plaintiffs also claim they are entitled to retention incentive payments of six weeks pay for remaining with Four Star until it was sold. Plaintiffs contend they should receive the payments because their continued employment was essential to the sale of Four Star as a going concern. At the managers meeting in June 1991, Thieme said that some type of incentive would be offered to encourage employees to remain during the reorganization. In June 1992, Miles told employees that an additional six weeks of pay would be offered to employees who remained during the transition. At both meetings it was stated that affected employees would receive letters prior to termination describing their severance package. Defendants offered retention incentives to Agfa Copal division employees whom the company wanted to retain until their release dates.

The parties dispute whether the retention incentive is a plan enforceable under ERISA and whether, in any event, the plaintiffs are entitled to such payments. Plaintiffs argue the retention incentive payments were simply part of the severance package offered by defendants. Plaintiffs assert their claim to such payments under § 502(a) of ERISA,

contending that the incentive payments constitute "premium severance pay." Defendants respond that the retention incentive payments offered to certain Agfa Copal division employees were not part of a severance benefit plan within the meaning of ERISA. They also maintain that the retention incentive was never offered to plaintiffs. Because the claim for incentive payments is grounded in ERISA, the existence of an employee benefit plan is integral to the merits of plaintiffs' claim.[16]

The United States Supreme Court first addressed the standard for determining whether a benefits program constitutes an ERISA "plan" in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). *Fort Halifax* involved a Maine statute that required certain employers, on the closing of a plant, to give terminated employees a severance payment of one week's pay for each year of employment. *Id.* at 5, 107 S.Ct. at 2214. The Supreme Court held that the statute was not preempted "because the statute neither establishes, nor requires an employer to maintain, an employee welfare benefit 'plan'" under ERISA. *Id.* at 6, 107 S.Ct. at 2215 (footnote omitted). The Court explained that ERISA is only implicated "with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Id.* at 11, 107 S.Ct. at 2217. The Supreme Court held that "[t]he requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation." *Id.* at 12, 107 S.Ct. at 2218.

In light of *Fort Halifax*, the Eighth Circuit has delineated the applicable standard to determine whether a benefit plan falls within ERISA:

The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits. Simple or mechan-

---

**15.** Because FSML provided medical benefits plaintiffs did not incur any expense for continuation of medical coverage under COBRA when Four Star was transferred. It appears that some plaintiffs later incurred COBRA costs when their employment with FSML was terminated.

**16.** In this circuit, the existence of an ERISA plan is a jurisdictional consideration. *Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254, 256 (8th Cir.1994).

ical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.

*Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254, 257 (8th Cir.1994).

■ Defendants contend that a promise to pay a retention incentive is not an "employee welfare benefit plan" and does not implicate ERISA. Defendants' position finds support in the Second Circuit's opinion in *James v. Fleet/Norstar Financial Group,* 992 F.2d 463, 466–68 (2d Cir.1993). In that case, the employer, Fleet, decided to combine some of its operations and orally promised employees 60 days additional pay if they remained on the job until the consolidation was completed. Relying on *Fort Halifax,* the Second Circuit held that Fleet's promise to provide additional pay to employees who stayed through the consolidation did not constitute an ERISA plan because such payments did not require an ongoing administrative program to meet the obligation. *Id.* at 466–67.

The Second Circuit acknowledged that there were factual differences between the statutorily required severance pay involved in *Fort Halifax* and the incentive payment proposed by Fleet. The court noted that the employee's option to receive the money from Fleet in installments instead of a lump sum "did not change the basic situation." *Id.* at 466. Despite the fact that employees had different termination dates and varying eligibility for receiving the payment offered by Fleet, the court concluded that an ERISA plan was not created. *Id.* at 467. The court also found that the calculation of individual payments and deductions for taxes and fringe benefits did not require the establishment of a uniform administrative scheme. *Id.* Finally, the Second Circuit found that the reasoning of *Fort Halifax* applied even though the termination of employment from Fleet was definite rather than contingent. *Id.*

The court agrees with the Second Circuit that these factors do not control the issue of whether an ERISA plan existed under the *Fort Halifax* test. The court also notes that there are many similarities between the 60 days additional pay promised in *James* and the retention incentive payments at issue here. There is, however, one significant difference. In *James,* the employer exercised no discretion in determining the employees' eligibility for benefits as the 60 days additional pay was offered to every employee who remained on the job until the facility was closed. In this case, however, the retention incentive was offered only to a select group of employees who were scheduled for layoff as part of the Agfa merger. The particular circumstances of each employee's termination had to be analyzed by defendants to determine whether the employee's position was a key one. This criterion had to be applied on a case-by-case basis and involved the "the sort of discretionary decision-making by the plan's administrator that is the hallmark of an ERISA plan." *Bogue v. Ampex Corp.,* 976 F.2d 1319, 1322 (9th Cir.1992).

In *Bogue,* the employer promised to pay a one-time, lump-sum severance benefit to executives if the company were taken over and the executives were not offered "substantially equivalent employment" with the purchaser. *Id.* at 1321. The Ninth Circuit noted that the employer's obligation was, as in *Fort Halifax,* a one-time, lump-sum payment contingent on a future event. But because "that event would occur more than once, at a different time for each employee" and the employer had to make a substantive "substantially equivalent" determination in each case, the court found the severance program comprised an ERISA plan. *Id.* at 1323.

As in *Bogue,* the amount of employer discretion involved in providing the retention incentive payments draws this case within ERISA's ambits. "There was no way to carry out [defendants'] obligation with the unthinking, one-time, nondiscretionary application [involved] in *Fort Halifax." Id.* "Although its application was uncertain, its term was short, and the number of its participants was small, the program's administration required a case-by-case, discretionary applica-

tion of its terms." *Id.* The discretionary determination of whether a certain employee occupied a key position cannot be considered mechanical. The court finds that defendants were required to engage in an "ongoing, particularized, administrative, discretionary analysis" sufficient to make the retention incentive program an ERISA "plan". *Id.*

The conclusion that the nature of the retention incentive payments required an ongoing administrative scheme to administer the promised benefits does not carry the day. Plaintiffs still need to establish that the program described above is enforceable under ERISA. Plaintiffs argue, and the court accepts for purposes of this motion, that the retention incentive payments were part of defendants' severance plan. It is well established, however, that oral representations cannot modify a valid written ERISA plan. *United Paperworkers Intern. Union, AFL–CIO v. Jefferson Smurfit Corp.*, 961 F.2d 1384, 1386 (8th Cir.1992). An oral representation may be enforced under ERISA only if it has been "reduced to writing and incorporated, in some fashion, into [a] formal written ERISA plan." *Id.* Defendants' oral promises to pay retention incentives were reduced to writing in letters sent to individual employees; those letters, however, do not constitute ERISA plan documents. The oral promises cannot be considered a part of the written severance plans as they were never incorporated into the plans.

In the alternative, plaintiffs argue that the retention incentive payments promised by defendants constituted an informal plan separate from the formal severance plans. Plaintiffs contend that an employee welfare benefit plan need not be in writing to be enforceable under ERISA. Some circuit courts have held that an informal severance arrangement may constitute an employee benefit plan subject to ERISA.[17] The Eighth Circuit has not indicated whether oral remarks that do not modify the terms of a

written plan may be considered evidence of a separate welfare benefit plan.

Plaintiffs assert that an informal plan may exist independent of, and in addition to, a formal plan as long as the informal plan meets the *Donovan* elements. *See, e.g., Elmore v. Cone Mills Corp.*, 23 F.3d 855, 861 (4th Cir.1994); *Henglein v. Informal Plan for Plant Shutdown Ben. for Salaried Employees*, 974 F.2d 391, 400–01 (3d Cir.1992). The Third Circuit has stated that:

> [W]here ... oral remarks give evidence of a separate plan not precluded by a written plan, the district court may credit the representations as evidence of a plan.... To do otherwise would create a loophole inconsistent with ERISA by allowing a plan sponsor to make any promise regarding benefits without obligation, so long as the promise is not reduced to writing.

*Henglein*, 974 F.2d at 401. Without deciding the proper treatment of oral remarks that may suggest a separate plan not at odds with a written plan, the court, for purposes of this motion, assumes that the Eighth Circuit would embrace the reasoning of *Henglein*.

It is undisputed that one of the terms of the oral retention incentive program was that affected employees would receive letters prior to termination identifying their layoff dates and describing their severance package. Certain Agfa Copal division employees were offered an incentive payment upon the condition that they remain with the company until their release date. None of the plaintiffs received a letter notifying them that they were going to be laid off or offering them an incentive payment to remain with Miles until the sale of Four Star or their termination. The Four Star employees were not involved in the Agfa consolidation, were not laid off and were never offered the retention incentive. The court concludes that plaintiffs were not entitled to an incentive

---

**17.** *Henglein v. Informal Plan for Plant Shutdown Ben. for Salaried Employees*, 974 F.2d 391, 400 (3d Cir.1992) (assurances that employees would receive benefits "equal to or better than" union benefits may be an ERISA plan); *Williams v. Wright*, 927 F.2d 1540, 1544–45 (11th Cir.1991) (letter to single employee was a benefit plan); *Brown v. Ampco–Pittsburgh Corp.*, 876 F.2d 546,

551 (6th Cir.1989) (employer's promulgation of severance guidelines created an ERISA plan); *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1504 (9th Cir.1985) (oral promise to pay severance may be a welfare benefit plan); *Blau*, 748 F.2d 1348 (9th Cir.1984) (confidential policy enforced under ERISA despite employer's concealment and lack of payment mechanisms).

payment. The court notes that this conclusion is consistent with the evident intent of the incentive payments, namely to encourage employees slated for layoff to remain with Miles and keep the operation running during the reorganization.

## VII.

■ Plaintiffs also assert they are entitled to recover severance benefits and incentive payments based on the theory of federal common law estoppel. The Eighth Circuit has not directly answered whether principles of estoppel apply under ERISA. This court has held that ERISA permits a beneficiary to enforce a claim based on the federal common law of estoppel where the claim arises from an oral interpretation of ambiguous plan provisions. *Erickson v. Aetna Life Ins.*, 777 F.Supp. 1463, 1469 (D.Minn.1991). To state a claim of federal common law estoppel, a plaintiff must allege: (1) the plan provisions at issue are ambiguous such that reasonable persons could disagree as to their meaning and effect, and (2) that representations were made to the beneficiary involving an oral interpretation of the plan. *Id.* (citing *Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285–86 (11th Cir.1990)).

Ambiguous plan provisions are essential to a claim based on federal common law estoppel. Plaintiffs contend that the terms "wage" and "salary" as used in the 1991 policy and the 1992 plan are ambiguous and provide a basis for a federal common law estoppel claim. The court has already concluded that the terms "wage" and "salary" as used in the 1991 policy are not ambiguous. For the same reasons as stated above in connection with the 1991 policy, the court holds that no ambiguity arises from the use of the terms "wage" and "salary" in the 1992

plan. Even if, as plaintiffs contend, the terms are ambiguous, there is no evidence that defendants made any oral interpretations concerning those plan provisions. The court concludes that plaintiffs cannot recover the benefits they seek on a theory of federal common law estoppel.

■ Plaintiffs also claim they are entitled to payment of the amounts promised by defendants under the theory of promissory estoppel. Plaintiffs contend that defendants' statements led them to believe they were to receive severance upon termination. Plaintiffs argue they are entitled to severance because they fulfilled their obligation by not leaving Four Star prior to their termination or release date. It is well established that claims of promissory estoppel asserted under state law are preempted by ERISA. *Anderson v. John Morrell & Co.*, 830 F.2d 872 (8th Cir.1987). Accordingly, the court holds that defendants are entitled to summary judgment on plaintiffs' promissory estoppel claim.[18]

## VIII.

Plaintiffs claim that defendants breached various fiduciary duties owed to them.[19] Welfare benefit plans, including severance plans, are subject to the fiduciary responsibility standards of §§ 1101–1114. Plaintiffs contend that defendants violated a host of fiduciary duties, including the duty of loyalty, the prudent person standard, the prohibitions against party in interest transactions, the duty to remedy the breach of a co-fiduciary and the duty to use reasonable care. Plaintiffs seek to recover severance pay and other benefits as damages for breach of fiduciary duties.

---

**18.** Even if the claim were not preempted, the plaintiffs have not established detrimental reliance. Reliance must be more than mere speculation; an actual change in the employee's position is required. *See Dumas v. Kessler & Maguire Funeral Home, Inc.*, 380 N.W.2d 544, 548 (Minn. Ct.App.1986) (employee's continued employment with an employer not sufficient reliance to support promissory estoppel claim). Moreover, most of the plaintiffs were not even aware of the severance policy or the incentive payments prior to the sale of Four Star.

**19.** Defendants withdrew their argument that plan participants cannot recover damages for breach of fiduciary duty under ERISA in light of the Eighth Circuit's decision in *Howe v. Varity Corp.*, 36 F.3d 746 (8th Cir.1994) (holding that individual plan participants may maintain a cause of action for their own benefit based on a breach of fiduciary duty under § 502(a)(3)).

Plaintiffs assert that their claims for severance pay and incentive payments were wrongfully denied due to defendants' alleged violation of fiduciary standards. As discussed above, the denial of plaintiffs' claims for benefits was consistent with the applicable plans. The severance plans were not applied in a discriminatory manner and the distinctions drawn between plaintiffs and other employees were reasonable. The court holds that summary judgment is warranted on the merits insofar as plaintiffs' breach of fiduciary duty claims assert the wrongful denial of benefits.

Plaintiffs contend that defendants' failure to comply with ERISA's disclosure requirements constitutes a breach of fiduciary duty. ERISA requires employers administering welfare benefit plans to provide employees with a written summary plan description that reasonably apprises employees of their rights and obligations under the plan. 29 U.S.C. § 1022(a)(1). ERISA allows an employer 210 days after the end of the plan year within which to distribute a plan and meet the disclosure requirements. *Id.* § 1024(b)(1).

The 1992 plan, which governs plaintiffs' claims to benefits, and a summary plan description were distributed to plaintiffs within the statutory period. The court recognizes that the distribution of written materials to plaintiffs occurred months after the sale of Four Star. There is nothing in ERISA, however, that requires disclosure be accelerated where divestiture is contemplated or is imminent. Defendants concede that they failed to distribute a written summary of the 1991 policy to plaintiffs. The significance of this breach is unclear as plaintiffs' claims for benefits were decided under the 1992 plan.

The court assumes, for present purposes, that defendants breached a fiduciary duty owed to plaintiffs under ERISA. Even so, plaintiffs cannot recover the type of relief they seek. Plaintiffs seek to recover benefits which they maintain are due to them under the applicable plans as damages for defendants' breach of their fiduciary duties. Plaintiffs cannot, however, maintain an action for breach of fiduciary duties to recover benefits to which they are not otherwise entitled. The court concludes that defendants are entitled to summary judgment on plaintiffs' claims for breach of fiduciary duties.

### CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**